IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| VERNON W. MILLER, | ) | Civil No. 09-1526-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

      Susan D. Isaacs
      Attorney at Law
      4915 S.W. Griffith Drive, Suite 105
      Beaverton, OR 97005-2933

      Linda S. Ziskin
      Attorney at Law
      P.O. Box 2237
      Lake Oswego, OR 97035

          Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION - 1

Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204-2902

Nancy A. Mishalanie
Special Asst. U.S. Attorney
Office of the General Counsel
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

   Attorneys for Defendant

JELDERKS, Magistrate Judge:

   Plaintiff Vernon Miller brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for Disability Insurance benefits under the Social Security Act (the Act).   Plaintiff seeks an Order reversing the Commissioner's decision and remanding the action to the Social Security Administration (the Agency) for an award of benefits.

   For the reasons set out below, the decision of the Commissioner should be affirmed.


**<u>Procedural Background</u>**

   Plaintiff first applied for disability benefits in January, 1993, and was found to be disabled during a closed period beginning on January 12, 1993, and ending on February 1, 1995.

   Plaintiff filed a second application for Disability Insurance benefits on February 5, 2003, alleging that he had been disabled since January 1, 2001.  After that application was

FINDINGS AND RECOMMENDATION - 2

denied initially and upon reconsideration, plaintiff timely requested a hearing before an
Administrative Law Judge (ALJ).

Pursuant to that request, a hearing was held before ALJ Riley Atkins on December 22,
2004.  No Vocational Expert (VE) testified at that hearing, because it was determined that the
VE who was scheduled to testify had been involved in plaintiff's earlier rehabilitation efforts.
ALJ Atkins held a supplemental hearing on February 28, 2005, to take the testimony of a VE.

In a decision filed on April 1, 2005, ALJ Atkins found that plaintiff was not disabled
within the meaning of the Act.  That decision became the final decision of the Commissioner
on October 18, 2006, when the Appeals Council denied plaintiff's request for review.

Plaintiff brought an action seeking judicial review of that decision in this court.  That
action concluded with a stipulated remand for further proceedings pursuant to an Order filed
on January 4, 2008.  The Order required the Appeals Council to remand the action to an ALJ
to reevaluate plaintiff's ankle and visual impairments, reconsider plaintiff's residual
functional capacity during the period after March 31, 2001, and take testimony from a
Medical Expert (ME).  The Appeals Council noted that, in denying plaintiff's claim, the ALJ
appeared to have "narrowly considered the period from January 1 to March 31, 2001, and
concluded that the claimant did not obtain treatment or have medical records during that brief
period, instead of taking into account the period shortly after March 31, 2001."

On remand, plaintiff's case was assigned to ALJ Linda Haack.  ALJ Haack conducted
a hearing on October 15, 2008, and issued a decision on December 22, 2008, finding that
plaintiff had not been disabled from January 1, 2001, through March 31, 2001, his date last
insured.  That decision became the final decision of the Commissioner on October 30, 2009,

when the Appeals council denied plaintiff's request for review.  In the present action,

plaintiff seeks review of that unfavorable decision.

Though plaintiff's application for Disability Insurance benefits was denied, he has

been receiving Supplemental Security Income payments since he became 50 years old in

2005, based upon an application he filed on April 21, 2005.   That application was granted

based upon plaintiff's limitation to sedentary work, his age, and vocational factors.

## Factual Background

Plaintiff was born on June 25, 1955.  He was 45 years old at the time of his date last

insured, and 53 years old at the time of his most recent hearing before an ALJ.  Plaintiff has

a high school education, and has past relevant work as a pipe fitter/machinist, a marine

machinist, a shipping and receiving worker, and a delivery worker.  He alleges that he

became disabled as of January 1, 2001, because of combined impairments, including arthritis

and pain resulting from traumatic musculo-skeletal injuries, diminished vision caused by

optical nerve atrophy, and a pain disorder.

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is

disabled within the meaning of the Act.  20 C.F.R. §§ 404.1520, 416.920.  Below is a

summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094,

1098-99 (9th Cir. 1999).

Step One.  The Commissioner determines whether the claimant is engaged in

substantial gainful activity (SGA).  A claimant engaged in such activity is not disabled.  If the

claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two.  20 C.F.R. § 404.1520(b).

Step Two.  The Commissioner determines whether the claimant has one or more severe impairments.  A claimant who does not have such an impairment is not disabled.  If the claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three.  Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the impairments listed in the SSA regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled.  If the claimant's impairment does not meet or equal one listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four.  20 C.F.R. § 404.1520(d).

Step Four.  The Commissioner determines whether the  claimant is able to perform work he or she has done in the past.  A claimant who can perform past relevant work is not disabled.  If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five.  20 C.F.R. § 404.1520(e).

Step Five.  The Commissioner determines whether the claimant is able to do any other work.  A claimant who cannot perform other work is disabled.  If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do.  The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix

2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(f)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

**<u>Medical Record</u>**

Plaintiff was seriously injured when he fell while working as a roofer in 1981. He fractured his right heel and ankle, both wrists, both elbows, and his jaw, and injured his left eye socket. As a result of these injuries, he has had numerous surgeries, and has permanent partial loss of vision in one eye.

Testing in June, 1989, showed that plaintiff had lost 26% of the visual field in his left eye, and had a total loss of vision of 31%.

On January 8, 1989, plaintiff told Dr. J. Scott Struckman, his treating physician, that his employer had laid him off because of his work restrictions, which precluding prolonged standing or walking, walking on uneven ground, and climbing and squatting. Dr. Struckman stated that plaintiff's condition had temporarily worsened because of his increased activities, but that he had "enough deformity in his ankle that he could develop arthritis which may be actually worsening as time passes and lead to progressively worsening symptoms." He opined that plaintiff needed to find a "semi-sedentary" occupation.

On May 22, 1992, Dr. Struckman noted that plaintiff continued to "slowly but steadily get worse." He opined that further surgeries would be necessary, and opined that plaintiff

was "going to have to go to a totally sedentary type of job . . . ."  He added that there was "little that can be done . . . short of a rather major destructive surgical procedure."

On December 1, 2000, plaintiff was diagnosed with traumatic arthritis status post fracture.  His foot was "held in a residual varus position."

It appears that only one medical record in the extensive administrative file was made during the relevant three-month period from January 1, 2001, through March 31, 2001.  That record is a chart note dated February 26, 2001, written by Larry Jensen, DPM, a foot specialist, who noted that plaintiff was experiencing continued pain in his right foot, and sought modification of an orthotic heel lift.  The lift was modified "to effectively decrease the vargus nature of his heel."

On May 17, 2001, plaintiff was seen by Dr. David Wisdom, at an orthopedic & fracture clinic.  Dr. Wisdom advised plaintiff that his medical problems were unlikely to improve with further conservative care.  He recommended surgery, and noted that plaintiff wanted "to get on with . . . treatment as soon as possible in order to protect his job . . . ."

Chart notes dated May 21, 2001, stated that plaintiff was currently "employed as a marine Machinist in the shipyards, a job he hopes to stay with, although he has been off work due to lay-offs since the 1st of April."

On June 13, 2001, Dr. T. S. Woll diagnosed right ankle and subtalar post traumatic arthritis with right calcaneal malunion.  On July 12, 2001, Dr. Woll performed a subtalar bone block fusion with calcaneal osteotomy.  Bone was taken from plaintiff's hip for grafting.  In addition, an open debridement was performed, and plaintiff's Achilles tendon was lengthened.  Plaintiff's ankle joint was described as "extremely irregular," and plaintiff underwent many months of physical therapy following the surgery.

FINDINGS AND RECOMMENDATION - 7

In notes dated October 29, 2002, Dr. Woll stated that plaintiff had "gone on to posttraumatic arthrosis of the ankle status post debridement and status post subtalar fusion." He noted that plaintiff continued to experience "a great deal of pain in the ankle" and opined that he would "not return to his previous employment."  Dr Woll opined that plaintiff would "remain with a permanent partial disability which will limit his standing for approximately two hours in an eight-hour day, carrying less than 25 pounds, and no climbing ladders."

On a referral from Dr. Woll, Dr. Peter Bonafede examined plaintiff on January 27, 2003.  Dr. Bonafede noted that plaintiff reported continued swelling in his right ankle and swelling in his left wrist with use.  Plaintiff reported severe pain in his right ankle and pain in his left wrist and elbow.  On examination, Dr. Bonafede found a small flexion deformity in plaintiff's right elbow, tenderness over the left elbow, and significantly reduced movement in plaintiff's left wrist.  He noted that plaintiff had "significantly reduced movement" of his right ankle,  and that movement in that ankle was "quite painful."  Dr. Bonafede found marked atrophy in plaintiff's right calf, and noted plaintiff's antalgic gait.  He suspected post traumatic degenerative arthritis of the right ankle and left wrist, and told plaintiff he thought there was little that could be done to improve his situation.

In a letter dated April 3, 2003, Dr. Woll stated that, because of his "severe debilitating injury," plaintiff was "permanently disabled and is not able to return to his previous employment."  He added that, "as he is permanently disabled, I would appreciate it if he would receive any benefits to which he is entitled."

Dr. Kirk Wong, an orthopedist, examined plaintiff on April 22, 2003, based on a referral from Dr. Woll.  Dr. Wong noted that plaintiff's main concern was weakness of grip

strength and "clumsiness in his hands."  He diagnosed radial nerve entrapment, stiffness due to extensor tendon adherence, carpal tunnel syndrome, and cubital tunnel syndrome.

In a letter dated March 5, 2004, Dr. Woll stated that plaintiff was "off work because of his chronic pain syndrome."  Dr. Woll opined that plaintiff was "unable to work due to problems with constant pain which interferes with his cognitive abilities."  He added that plaintiff was "physically unable to do much more than sedentary activities."  Dr. Woll opined that plaintiff was "disabled significantly both cognitively and physically and is unemployable," and added that this condition would "continue indefinitely."

**Hearing Testimony**

1. **Plaintiff's testimony**

A. **First Hearing**

Plaintiff testified as follows at the first hearing.  Plaintiff did not work during the relevant period, January 1, 2001, through March 31, 2001.  Plaintiff was having difficulty performing his job before April 2, 2001, when he returned to work for one day.  He had taken days off work because of pain, and had been able to do his job because people would help him, or he was able to switch jobs if the work he had been assigned proved to be too difficult. When he worked, plaintiff had primarily used his right arm, and had used his left arm only for support.

During the three-month period before the expiration of his insured status, plaintiff could walk a block or two at a time.  Though he could stand for 30 minutes, he needed to move around and lean on something, or lift his foot.  He obtained the greatest pain relief by elevating his foot, and he needed more frequent breaks if he were active.  Pain interfered with

his concentration, and caused him to forget what he was doing. He had trouble holding onto small objects.

In 1992, plaintiff was taught how to do computerized medical billing as part of a retraining program. He had typed slowly and made many mistakes, and concluded that he could not perform the work competitively because he was unable to use his left hand effectively, and because problems with that hand interfered with his concentration.

Plaintiff has had vision problems since his face was fractured in the accident in 1981. He has optical atrophy, and has lost some of the vision in his left eye.

During the relevant period in early 2001, plaintiff had the same kind of difficulty doing work around the house and taking care of himself that he had at the time of the hearing. Plaintiff has trouble completing tasks, drops dishes, and needs an hour and a half to complete tasks that should take only 15 to 20 minutes. At the time of the hearing, and during the relevant period, plaintiff had sleep disturbances.

B. **Second Hearing**

At the second hearing, the ALJ posed a vocational hypothetical limiting plaintiff to sedentary work. The VE testified that those limitations precluded performance of plaintiff's past relevant work, but would allow an individual to work as an electronics assembler, an animal shelter clerk, or a timekeeper. The VE testified that a limitation to no more than occasional use of the left wrist would eliminate the electronic assembly job, and that missing four hours of work per week would eliminate all competitive employment.

The VE testified that voice activated computers are "extremely common" in the workplace, and could be used to compensate for a limitation in left hand use. The provision

of such equipment would be a special arrangement, or accommodation, if a company did not

have it already.  The need to change positions every hour, and the need for an additional

5-10 minutes to allow for memory problems when resuming work, would eliminate all

employment.  The VE testified that a worker who needed to elevate his foot two or three

times per hour could work as an animal shelter clerk or as a timekeeper.


C.  **Third Hearing**

At the third hearing, which was held following remand, plaintiff testified that he had

last worked, for one day, in April, 2001, after having been "laid off for some time."  Plaintiff

testified that when he returned to work that day he realized it was "all over" for him, because

he could not perform even the easier jobs that were assigned.   The ALJ asked plaintiff about

a medical record indicating that he had told a doctor in May, 2001, that he had been off  work

since April, 2001, because of a lay-off.  Plaintiff testified that he did not know why he had

told a doctor that, and that he had been confused.  He added that he had gone to work for one

day in April, 2001, had experienced "severe pain," and had told his employer that he "could

not do it any more."  Plaintiff testified that he had thought he had told his doctor that he had

stopped working because of pain.  He also testified that he would not have left if he could

have tolerated the work, because his union rights would have vested if he had worked another

eight weeks, and he "would have had money for disability from them as well."  He added that

he "wouldn't have left that" unless he had to.

**Medical Expert Testimony**

**Dr. George Caspar**

Dr. Caspar, an opthalmologist, testified that plaintiff had suffered some optic nerve atrophy and vision loss as a result of the accident in 1981. He agreed with the evidence of a 26% loss of vision in plaintiff's left visual field, and testified that the optic atrophy had not progressed. Dr. Caspar agreed that it was reasonable to assume that there was a slight danger that plaintiff would not see something approaching from the left.

**Dr. David Rullman**

Dr. Rullman, an internist, opined that plaintiff could have performed sedentary activities during the relevant time period, and testified that he understood that plaintiff would have been able to sit "essentially without limitation" and stand for thirty minutes at a time, for a total of less than two hours, during an eight-hour work day at that time. He opined that it would have been advisable for plaintiff to elevate his leg for a month or two following surgery, and that plaintiff would have been left to use his own judgment after that. Dr. Rullman concluded that medical opinions as to plaintiff's ongoing inability to return to work referred to plaintiff's work capacity as a marine machinist rather than an inability to perform any full time work. He agreed that plaintiff's condition did not improve following surgeries performed after his insured status expired, and could offer no opinion as to plaintiff's ability to stand and walk during the first three months of 2001.

**ALJ's Decision**

The ALJ found that plaintiff had met the insured status requirements through March 31, 2001. At the first step of her disability analysis, the ALJ found that plaintiff had not engaged in substantial gainful activity during the period at issue–January 1, 2001, through March 31, 2001.

At the second step, the ALJ found that plaintiff's severe impairments during the relevant period included optic nerve atrophy, post traumatic arthritis of the right ankle and calcaneal malunion healing of a fracture in the right foot, and pain in the left wrist and elbow.

At the third step of her analysis, the ALJ found that, between January 1, 2001, and March 31, 2001, plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526).

The ALJ next determined that plaintiff could read, write, add, and subtract, and was right-hand dominant. She found that plaintiff retained the functional capacity required to sit for two hours at a time, with normal breaks, for a total of eight hours during an eight-hour work day; could stand for 15 to 30 minutes at a time for no more than two hours total during an eight-hour day; could walk up to a block or up to 15 minutes at a time for a maximum of two hours during an eight-hour work day; and was limited to no more than two hours of combined standing and walking during that eight-hour period. The ALJ found that plaintiff could lift and carry 10 to 15 pounds, could use his right upper extremity without difficulty and could use his left hand as a "helper," could not operate foot controls, could push or pull within the stated limits given for lifting, and could not walk on uneven surfaces. She found that plaintiff could stoop occasionally; needed to avoid ladders, crouching, crawling,

squatting, or climbing stairs; and needed to avoid unprotected heights, vibration, balancing,

hazards, and extreme cold.  In addition, the ALJ found that plaintiff could perform routine,

repetitive tasks, needed to avoid work requiring a visual field on the left extending 45 to 90

degrees, and needed to avoid work from which he might expect danger on the left side, such

as moving machinery.

In assessing plaintiff's residual functional capacity, the ALJ found that plaintiff's

"statements concerning the intensity, persistence and limiting effects of those symptoms are

not credible to the extent they are inconsistent with" her functional capacity assessment.

At the fourth step of her disability analysis, the ALJ found that plaintiff could not

perform his past relevant work during the relevant period in early 2001.

At the fifth step, the ALJ found that plaintiff could work as a food assembler, a

companion, or a surveillance-system monitor, and that these positions existed in substantial

numbers in the national economy.  Accordingly, she found that he was not disabled within

the meaning of the Act during the period in question.


**Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity

by reason of any medically determinable physical or mental impairment which . . . has lasted

or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 423(d)(1)(A).  The initial burden of proof rests upon the claimant to establish his or her

disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122

(1996).  The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan,

924 F.2d 841, 849 (9th Cir. 1991).

FINDINGS AND RECOMMENDATION - 14

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that, in concluding that plaintiff was not disabled during the relevant three-month period, ALJ Haack failed to comply with the Remand Order; improperly rejected the opinion of Dr. Woll, plaintiff's treating physician; failed to include all the plaintiff's limitations in her RFC assessment; and erred in concluding that plaintiff's testimony was not entirely credible.

## 1. **Compliance With Remand Order**

In its Order remanding plaintiff's application for further proceedings, the Appeals Council instructed the ALJ to reassess plaintiff's visual and ankle impairment, and assess plaintiff's RFC using evidence from medical experts.  The Appeals Council noted that, in finding that plaintiff was not disabled during the relevant period, the first ALJ "appears to

have narrowly considered the period from January 1, to March 31, 2001, and concluded that

the claimant did not obtain treatment or have medical records during that brief period, instead

of taking into account the period shortly after March 31, 2001." The Appeals Council noted

that medical records from May through July, 2001, showed that plaintiff's ankle impairment

was "getting steadily worse," and observed that the ALJ had "rejected Dr. Woll's reports

because he treated the claimant after March 2001, although the claimant's ankle impairment

clearly predated that period and resulted in further surgery in July 2001."

     Plaintiff contends that ALJ Haack, like ALJ Atkins, "improperly considered. . .

medical evidence in a narrow fashion," and failed to properly account for Dr. Woll's opinion

that he "was unemployable both because of his sedentary restrictions and because of chronic

pain which interfered with his cognitive abilities." Plaintiff notes that Dr. Woll observed that

he "continues to be disabled." He asserts that "[t]here is no evidence to support the ALJ's

belief that Plaintiff's ankle pain suspended itself during the short relevant period." Plaintiff

also notes that Dr. Rullman, who testified at the hearing before ALJ Haack, stated that his

"pain and functional problems were present from before the relevant period and continued

through that period." Plaintiff adds that Dr. Rullman opined that he could stand and walk for

less than two hours during the relevant period. He contends that this establishes his inability

to meet the minimum functional capacity requirements for sedentary work, which includes

the ability to stand and walk for two hours during an eight-hour work day.

     Based upon a careful review of the Remand Order, the medical record, the transcript

of the relevant hearing, and the relevant decision, I conclude that the ALJ complied with the

Appeals Council's order to take "into account the period shortly after March 31, 2001," in

evaluating plaintiff's disability claim. The ALJ considered Dr. Woll's opinion concerning

plaintiff's limitations, and, like ME Rullman, reasonably concluded that Dr. Woll had addressed plaintiff's inability to return to his past work as a marine machinist, and not his inability to perform all work.  Nothing in the ALJ's decision supports plaintiff's argument that the ALJ found that his ankle pain "suspended itself" during the three-month period at issue here.  Instead, the ALJ simply analyzed plaintiff's impairments, including his significant ankle impairment, and concluded that, despite his ankle pain, plaintiff could perform sedentary work during the relevant period.  She specifically noted that "medical records reveal clear evidence of right ankle impairment resulting in significant limitations in the claimant's ability to stand and walk."

The ALJ complied with the Appeals Council's order that evidence concerning plaintiff's condition in the period shortly following the expiration of plaintiff's insured status be considered, and her conclusion that plaintiff retained the capacity to perform sedentary work during the relevant period was supported by substantial evidence in the record.  Though Dr. Rullman testified that he could not "express an opinion" as to how long plaintiff could have stood or walked during the relevant period, he added that plaintiff was capable of performing sedentary work during the relevant period, based upon evidence in the record.  As both Dr. Rullman and the ALJ noted, this evidence included treatment notes dated May 17, 2001, indicating that plaintiff was currently employed as a marine machinist in the shipyards, that plaintiff wanted to continue to work in that position, and that plaintiff had been off work "due to lay-offs since the 1st of April."  The conclusion that plaintiff retained the capacity to perform sedentary work during the relevant period was reasonable and was supported by evidence that the ALJ cited.

FINDINGS AND RECOMMENDATION - 17

2. **Determination That Plaintiff's Impairments did not Meet or Equal Listed Impairment**

　　As noted above, at the third step of her disability analysis, the ALJ found that between January 1, 2001, and March 31, 2001, plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1 (20 C.F.R. 404.1525 and 404.1526).   Plaintiff contends that the ALJ's findings at step three were "cursory and do not fully consider the extent" of his orthopedic injuries.  He contends that he has "most, if not all, of the elements required to meet several of the Listings in section 1.00 of the Listings of Impairments, in addition to his multiple other orthopedic problems and his severe vision loss."  Plaintiff argues that he "seems to meet Listing 1.02, and, if he does not, he is so close that, with consideration of his visual impairment considered in combination, he certainly equals this Listing."  He asks the court to make a finding, at Step 3, that his condition "equals Listing 1.02."

　　These arguments fail.  As the Commissioner correctly notes, in order to establish that his impairments meet a Listing, a claimant has the burden of showing that every element described in the listing is present,  20 C.F.R. § 404.1525(d), and an impairment meets a Listing only if it "manifests the specific finds described in the set of medical criteria for that listed impairment."  SSR 83-19.  To satisfy the requirements of Listing 1.02, a claimant's major joint dysfunction must be accompanied by an inability to "ambulate effectively" within the meaning of relevant provisions, or include involvement of a major peripheral joint in each upper extremity, resulting in an inability to perform fine and gross movements effectively, also as described in relevant provisions.  The ALJ's conclusion that plaintiff was not precluded from effective ambulation or the use of his upper extremities, and had no

significant reflex, sensory, or motor loss, was supported by the record.  The Commissioner

correctly notes that the ALJ's reference to plaintiff's use of his upper extremities related to

the definition of effective ambulation, 20 C.F.R. § 404, Subpt. P, App. 1, and that the ALJ's

consideration of "reflex, sensor, or motor loss" reflects consideration of plaintiff's

neurological functioning, which is a component of the diagnosis and evaluation in the

musculoskeletal listings.  20 C.F.R. §404, Subpt. P, App. 1, 100C1.

    To establish that his impairments equal a Listing, a claimant must show that the

medical findings are at least equal in severity to the criteria for the listed impairment most

like the claimant's impairment.  Sullivan v. Zebley, 493 U.S. 521, 531 (1990).   Equivalence

is not established by showing that the "overall functional impact" of unlisted impairments is

as severe as that of a listed impairment, and the "functional consequences of the

impairments" cannot be used to demonstrate equivalence.  Id. at 531-32.

    An ALJ is required to discuss the combined effects of a claimant's impairments only

if "the claimant presents evidence in an effort to establish equivalence."  Burch v. Barnhart,

400 F.3d 676, 683 (9th Cir. 2005).  Here, plaintiff did not offer the ALJ any reasons why his

combined impairments equaled a listed impairment.  The ALJ thoroughly reviewed the

record, and her conclusion that plaintiff's impairments did not equal a listed impairment was

supported by substantial evidence in the medical record.


3. **ALJ's Credibility Assessment**

    Plaintiff contends that the ALJ erred in finding that he was not wholly credible.  He

contends that this finding was improper because the ALJ "made a cart-before-the-horse

credibility finding" by concluding that his statements were "not credible to the extent they are

FINDINGS AND RECOMMENDATION - 19

inconsistent with the . . . residual functional capacity assessment." Plaintiff contends that the ALJ appears to have first "constructed" her RFC assessment, and then accepted or rejected the evidence depending on how well it fit with that assessment. He asserts that the court should remand the action for "proper credibility findings," or for an award of benefits.

The Commissioner asserts that, "[a]lthough the ALJ's decision conforms to the agency boilerplate, which is less than a model of clarity, her reasoning and conclusions that follow more than adequately explain her credibility finding." I agree. If a claimant produces medical evidence of an underlying impairment, an ALJ may not discredit his testimony concerning the severity of his symptoms merely because they are not supported by objective medical evidence, and in the absence of affirmative evidence of malingering, an ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

Here, there was no evidence of malingering, and there was substantial medical evidence that plaintiff had significant impairments. Though she first asserted that plaintiff's statements were not credible to the extent they were inconsistent with her RFC assessment, the ALJ subsequently provided the required support for her credibility determination. The ALJ cited inconsistencies between plaintiff's allegations and the medical record, plaintiff's statements regarding medication which were inconsistent with the evidence in the record, plaintiff's activities which were inconsistent with his allegations concerning his limitations during the relevant period, and inconsistent statements plaintiff had made concerning his ability to work during the relevant time period, including his work as a self-employed contractor. These were clear and convincing reasons for discounting plaintiff's credibility, and the challenge to the ALJ's credibility determination fails.

4. **ALJ's Reliance on Vocational Testimony**

Plaintiff contends that the ALJ erred at step five of her analysis in finding that, during the relevant period, he could have worked as a food assembler, a companion, or a surveillance-system monitor.   He argues that the ALJ should not have relied on the VE's testimony because it inexplicably deviated from the Dictionary of Occupational Titles (DOT), and that the ALJ erred in relying on VE testimony that did not identify transferable skills. Plaintiff contends that, because two of the occupations cited by the VE required semi-skilled work, the ALJ was required to make findings concerning plaintiff's acquisition of transferable skills needed to perform such work.

These arguments fail.  At the hearing, the ALJ noted that the food assembly and companion positions required semi-skilled work, and reminded the VE that she had "asked . . . for routine, repetitive jobs."  She asked the VE if these positions were "essentially routine, repetitive tasks."  "Absolutely," the VE responded.  In her decision, the ALJ noted the discrepancy between the VE's testimony and the description of the cited positions as semi-skilled in the DOT, noted the VE's testimony that the positions in question involved "routine, repetitive tasks," and concluded that the VE's testimony was consistent with the DOT, except as she had described.  In doing so, the ALJ adequately supported her conclusion that she did not need to address the question of transferability of skills.

In any event, even if plaintiff was not able to perform either of the positions described as semi-skilled in the DOT, the surveillance system monitoring position was not a semi-skilled position.  The VE testified that an individual with the RFC found by the ALJ during the relevant period could perform that, as well as the other positions.  The ALJ's evaluation of the vocational testimony was reasonable, and should be affirmed.

## **Conclusion**

The Commissioner's decision should be AFFIRMED, and this action should be dismissed with prejudice.

## **Scheduling Order**

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due July 1 , 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 13th day June, 2011.


/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge